Our third case for this morning is Webb v. Frawley. Good morning. Mr. McKnight. Neil McKnight on behalf of the plaintiff appellant, Nicholas Webb. This matter comes before the court on a dismissal pursuant to 12b-6 of a two-count complaint filed by Nicholas Webb, sounding an intentional inducement to breach contract as well as a common law fraud claim. Can you explain what contract was breached? It was the employment contract between Mr. Webb and his employer, Jeffries. Which was employment at will? It was employment at will. So why does it breach an employment at will arrangement for an employer to dismiss an employee? Because the predicate for the dismissal of his claim was that the understanding that he was, what I will say, induced into conduct that was in violation of his employment agreement and that was a representation that was made both to the employer as well as to the employee. You know, I still don't quite understand because he doesn't really have a contract that can be interfered with and you have very firmly disclaimed any interest in pursuing a theory of interference with a prospective economic opportunity. That's like half of your reply briefs is no, no, no, no, we're not doing that. So I don't know where it is that employers don't have a right to fire people even for bad reasons if it's an employment at will. Obviously putting to one side statutorily protected statuses such as race or religion or what have you. But that's not in this case. He's just asserting that his supervisor, for reasons the district court had a hard time fathoming, decided to undermine him and somehow manipulated, I don't know, somehow made the company fire him? Yeah, well we addressed this actually. It was not addressed in the apply brief but it was addressed in the response brief below where the state of Illinois and the Illinois laws in the Cody decision and in Kemper versus Westchester found that this was a cause of action that could be pursued on the intentional interference. And I think what I'd like to explain to the court and I think what perhaps the best way to describe this is that Mr. Frawley came to Jeffries from New Edge and he came for the purposes of creating what I'll say this iron ore business that was done in commodities business as well. His former employer and my client's former employer in New Edge sues Jeffries and Jeffries goes into a crouch and it causes a problem for Mr. Frawley. No, I understand at least that much. It looks to me like one of those situations where Jeffries is in some legal difficulty from allegedly poaching employees and so we get to the point where they say, well let's not run the iron ore trades through Chicago, let's run them through London. That's legitimate or not is not before us happily. So that goes on and there's Mr. Webb thinking that he had been hired to do a certain amount of work in Chicago but it's not going to be done in Chicago. But where the district court had trouble and I certainly have trouble is figuring out how this fits into any of the legal theories you're pursuing. Where's the underlying contract? What in heaven's name would make Frawley better off by undermining the person who works for him and having that business destroyed basically? The company Jeffries doesn't want to do iron ore in Chicago anymore. Fine, they're not going to do iron ore in Chicago anymore. But why is it in Frawley's best interest to have his direct report, Webb, waste his time on a lot of effort to develop business that is doomed? What in the world? I think, and this is the point I'm getting at, what Mr. Frawley was, it's actually Jeffries' decision internally is broader than just moving it from Chicago to London. Later on, when the matter gets further along in May of 2013, Jeffries makes the decision we're completely out of iron ore. And why not? You would certainly agree that Jeffries is entitled to decide which kinds of trades they want to be in. That's absolutely right. The difference here is that Mr. Frawley came to Jeffries as an expert in iron ore and to develop. Well, I mean, so what? Business evolves. And he did. And what Mr. Frawley did is he hedged his bets, and he wanted to stay in the business, and he wanted to stay in the game for the lack of a better description. And he tells his underlings in his reports, he says, I want you to continue to work on the iron ore trade. And he did that under the color of authority that he had from Jeffries because Mr. Webb was unaware of whether or not Jeffries had made that determination. And so, like, what's next? In your theory of this, is Frawley breaking off from Jeffries and establishing his own business that's iron ore next? Or is Frawley's idea that he's going to have such delectable trades that Jeffries will reconsider its decision to get out of iron ore? I mean, this all sounds so speculative to me. No, it's actually not because we specifically allege that in the complaint where we say, look, he's looking to maintain his professional relationship and professional reputation in the business, and he does that by maintaining his contacts within the iron ore business as well as the potential for him – This is Frawley. Yeah, that's Frawley. As well as the potential for him to take that business, those contacts, those transactions to another location or another thing. Or potentially, I suppose he could go back to Jeffries and convince them to open up because it's profitable. But that didn't happen because – So you're essentially asserting self-dealing on the part of Frawley, that he's not being a faithful employee of Jeffries, that he's off there on his own, frolic and detour, and he's dragged Webb along with him? Is that it? I think that's correct. I think that's exactly what he's done. He's outside. He's rogue. He's doing directly what the executive committee at Jeffries says that he should not be doing. And he makes a representation, which is false on a number of occasions, to Mr. Webb saying, Mr. Webb, go out there and do what you're supposed to do, do these iron ore trades, knowing full well that Jeffries was never going to support those iron ore trades. Jeffries wasn't going to provide the back to it, and he specifically – he lied to them. He lied to Nicholas Webb, and that's the basis of the fraud complaint. He essentially said, I'm making – he made a material misrepresentation about what Jeffries was going to do. Mr. Webb specifically relied upon that to his detriment by engaging in this conduct when he could have been doing more profitable trades or working in another business or even developing another line of business in another area of the commodities business outside of iron ore. So can I just pause on the fraud claim? The district court was concerned that your allegations failed to meet the requirements of Rule 9b. Correct. And you're kind of spinning out possibilities here, but for a fraud claim, you've got to be pretty concrete, as we've said, the who, what, when, where, why, et cetera. Not like this might have happened, that might have happened. No, I think if you look through the – if the court looks through the complaint, particularly the paragraphs beginning at paragraph 41 and 43, 45, and 46, and then ultimately looking at the paragraphs at 72, there's specifically allegations of Mr. Frawley going to Mr. Webb and saying, do these things. And there's also a chronological stamp to that as well, too, because it all happens after the date on which the executive committee makes the determination that they're no longer going to be in the iron ore business. So for the purposes of establishing specific representations, those are pled specifically in the complaint. And then there's a general allegation at paragraph 72 of the complaint where it says those were done and those were misrepresentations. So to the extent that the court is requiring or that there's a specificity, that's in the complaint. There's dates, times, from Mr. Frawley to Mr. Webb directly. And then there's the specific allegation of the executive committee directing Mr. Frawley to tell his direct reports that they should no longer be engaged in this business. So we have the one, the allegation in the complaint that says Jeffries is out. There's the allegation in paragraph 42 where Jeffries tells Mr. Frawley, tell your direct reports. And then there's the subsequent allegations based upon the chronological and the timing that says Mr. Frawley then went to Mr. Webb on numerous occasions telling him to continue to participate in the iron ore trade when Jeffries had specifically done that. He's rogue at that point, and he's not acting in the best interest of Mr. Webb. He's certainly not acting in the best, in the interest of Jeffries. What's missing though, I mean he's certainly disobeying his employer. That's understandable. But every act of disobedience to an employer doesn't mean that you're self-dealing. You're not like the person in the business who happens to have a choice parcel of land and you sell it for a price that's favorable to you, not a price that's favorable to the company, or all of these classic examples of self-dealing. But also we specifically represent that he alleges and tells Mr. Webb that Jeffries was supporting those trades. But I understand that, but what the district judge kept asking you, and she never heard an answer, and I'm having trouble still, is how all of this in any way redounds to Mr. Frawley's benefit. And this is where the point I was making is that he can take those transactions, those deals, he can either go somewhere else or he can attempt to, as you described, potentially try to convince somebody else that this transaction, meaning within Jeffries, that they should be done. And if it doesn't go well, he can say that Mr. Webb was rogue. He can say Mr. Webb did this and he violated the rules. And so what he's done is he's set Mr. Webb up as the individual to keep him in the marketplace, and then Mr. Webb can take the fall. And, frankly, one of the things that was alleged, and I will acknowledge to the court, that it's not in the complaint, but it is in the response brief, and although Judge Bucklow did not believe that anything was suggested that way, we specifically mentioned in the response brief the portability of the transactions and the portability of business with people in the industry. And so we specifically stated that, look, you take that out, and that's an inference that can be made based upon the allegations of what I will call the moving the business and reputational business and the commercial dealings for them. So I think from my view of the complaint, I think the court looked at it from, and Judge Bucklow looked at it from the perspective of there's no possible way that this could happen. And, frankly, it seems to me, as I describe it, a hedge is exactly what these individuals in this business are in the business of doing. That's what they do. That's what they understand. And that's what Mr. Frawley did. And a hedge, when you do it in a trade, is not illegal. But when you do a hedge when you're dealing with your underling and then you're lying about what the representations are from your employer, that's where the fraud arises out of the claim. Can I ask you a couple of procedural questions, please? Yeah, sure. What's the amount in controversy here? It is more than $75,000, and, in fact— You had earlier disagreed with that? No, Your Honor, I think earlier— I thought you resisted removal. I resisted removal based upon a procedural failure, what I believe was a procedural failure on the part of Mr. Frawley to specify in his notice of removal the dollar amount, only being based upon what I would call the prayer for relief that was in my original complaint. And if you recall, you and I went back and forth on that the last time. You now agree that we have subject matter jurisdiction? I do agree you have subject matter jurisdiction, and that's already been determined. The other procedural question has to do with your argument that the district judge should have allowed you to amend your complaint. It warmed my heart to see the passage quoted at page 22 of your brief from McCauley v. City of Chicago, which I agree with because I wrote it, but it was from a dissenting opinion, which neither you nor the defense seems to have noted. And I apologize. That's quite an oversight. I believe it does now correctly state the law of the circuit procedurally through some later cases, but we ordinarily expect somebody who says we should reverse on a failure to grant leave to amend to have identified the amendments, and I don't see that in the district court. I don't see it here. I think that I would say to you that the discussion about the portability is what I would tell the court. And when does that first appear? That first appears in the response to the motion to dismiss, and it's document 96 at page 13 of that document that was filed. And we talk about it, and it's in response to the motion saying exactly what. Did you identify that there as amendments you would make? I don't think I did. I think later on. When have you done that? The only way in which we've done that is through what we'll call the wherefore paragraph, the response to the motion to dismiss where we ask for leave in the event. So you didn't identify that amendment to the district court, and where did you identify it for us as an amendment that you would have made to cure the problems? I don't believe we've done that. I don't think so either. Thank you. All right. If you'd like to save a bit for rebuttal. I will. Thank you. I will suggest that. Mr. Hawes. Good morning. May it please the Court. Matthew Hawes on behalf of Defendant Michael Frawley. Nicholas Webber has tried a dizzying array of litigation to try to recover some damages from the loss of his actual employment. Despite suing Jeffries in multiple jurisdictions and now Frawley, his boss, and then suing FINRA, he's multiplied costs. He's created this very vast litigation. All of it's been unsuccessful on the merits. A year ago, he was here telling this Court that the case should be remanded to state court because it didn't satisfy the minimum threshold of $75,000. Right. But can I say, if Webber had alleged some things that come within Illinois law, so, for example, that Frawley's conduct was intended solely to benefit Frawley, not anybody else, or intended solely to harm Webb, or a few other things, then it would start looking like a tortious interference claim. And we're not in the 9b part of the case now. We're in the first part. Explain to me why he hasn't stated a claim that Frawley was really self-dealing entirely, and so isn't under the umbrella of that at-will contract that you described. Well, I'm not sure that I would say that we ever leave the 9b space because the basis of the tortious interference is fraud. So I wouldn't necessarily concede that. But tortious interference cases don't have to be pleaded under the Rule 9 standard. Not generally, but if the underlying tort is fraud, which is what I think he would still be alleging in that case, then I would argue that 9b still applies. Nevertheless, there are other issues with that theory of self-dealing. For example, the tortious interference needs to be directed at the party who's allegedly breaching the contract, not the plaintiff. That's a basic fundamental rule of Illinois tort law. And this court stated that rule quite succinctly, and I'll cite the case in Fuller v. Chicago College of Orthopedic. Under Illinois law, liability for tortious interference may only be premised on acts immediately directed at a third party, which cause that party to breach its contract with the plaintiff. The theory would be this, that if Frawley is wearing a hat that says Frawley on it, he's not wearing a hat that says Jeffries on it, then Frawley is by causing Jeffries to breach its employment contract, such as it is. Employment at will is funny. It has some contractual aspects. It has many aspects for which there's no contractual protection. But if that's what the theory is, then at least you have the three parties that you need. You've got the fundamental, I'll call it, business arrangement between Jeffries and Webb, and you've got Frawley off there disrupting it. I'm not sure that the self-dealing still is directed anywhere but at the plaintiff in that case. He's alleging that he's being the source of all of his damages, he says, because I spent too much time laboring on iron ore. So that self-dealing, if that's what we're going to call it, is still directed at the plaintiff. His damages or the so-called reason why he lost his job was because he labored too long on those endeavors when he could have done other things. So suppose a different set of facts. Suppose Frawley's his supervisor. He works for Jeffries. He's in the iron ore business. But there's some other company, X, that Webb is thinking of going to, and Frawley goes to X and says, this guy's a disaster. You don't want him. He can't negotiate his way out of a box, whatever they say. X is now completely different. They're a third party. And if X then says, OK, we revoke the offer of employment we've just given you, well, that's a business relationship. Surely that would suffice as a pleading under Illinois law. I think that that's correct. So in other words, to get now Jeffries, in our case, to fire him, it's almost like a cat's paw kind of thing. But to get Jeffries to fire him is also an adverse action, right? It's an adverse impact on his employment, surely. But the Illinois law requires more, requires intent and inducement of that. And so the self-dealing, while it may have some unintended consequences, then it's not torturous interference. What about Mr. McKnight's hedging theory, I'll call it? I'm not sure I understand Mr. McKnight's hedging theory, to be quite honest. And it hasn't appeared in the briefs. He's trying to stay in the iron ore business and be the big hero for Jeffries. And at the same time, if it doesn't work out, have Webb be the flaw guy. I just don't think that's plausible under the complaint as pled. Frawley was the global head of metals at Jeffries. Webb is his inferior two times removed, just a traitor. So for him to say that he would use him as some kind of leverage to save his own job just doesn't make any sense. Also, the self-dealing theory that he's presented for the first time in front of this court, and I would say I'm not sure it appears in the briefs, is that the problem with that is that he actually alleges that Jeffries was aware of this pursuit. He alleges that he announced it to the department, basically, when the instruction. He says it was an email to various employees at Jeffries. And then he goes on to allege that Frawley actually tried to help him get approval for the trade with Jeffries. And that after Jeffries said, no, Beversdorf or Webb, it's not really clear who's who, goes to Frawley again, his supervisor, and says, let's try to get this approved. And they go the next day and they try to get it approved, and again, it's rejected. Which implies that pursuit of the business in general is just a strategy that's being employed. It's not prohibited. It's not going to end the relationship with Jeffries. As the global head of metals, it was within his purview to have his employees pursue business and show Jeffries that maybe they should change their mind about previous decisions. Ultimately, he was mistaken, but again, that's business judgment, especially someone at the high level that Frawley was at. Ultimately, that self-dealing argument is really an argument between Jeffries and Mr. Frawley. It doesn't really have much to do with the impact it may have had on Mr. Webb. So you would say if Mr. Frawley was, in fact, minding his own business, not Jeffries' business, that would be Jeffries' dispute with him. Sorry, say that one more time? Yeah, I mean what you just said. If Frawley was engaged in conduct designed solely to benefit himself, Frawley, then he's not being a loyal employee to Jeffries, and that's a problem Jeffries would need to take up with him. Exactly, but the facts of this case actually reflect just the opposite. It says that the motivation was he knew that he was going to lose employees at Jeffries, that he wanted to save his job, not just at Jeffries, or maybe the future. He wanted to save his reputation. So was he involved with the trades through London? Was Frawley involved with the London trades if he was the global head of metals? I would assume so. I don't know for a fact. I mean, I wondered, this is not really this case, but I wondered if there was any effort to evade U.S. regulation by shipping it all through London. None of those facts are really at issue in this case. I also think Court noticed a fundamental deficiency, which is that this is a tortious interference with contract claim. The reply brief did us a lot of favors by just saying, no, I'm not seeking tortious interference with economic advantage, which this Court knows does apply in sometimes at-will cases. But this Court has made very clear in Cody v. Harris, which Mr. McKnight unfortunately ascribed to the Illinois courts, it's actually this Court that said that, and it did not, nothing has changed since that decision was made. No Illinois court has disagreed with that, and the courts in this circuit have applied that rule consistently, which is that an at-will employee may be able to pursue a tortious interference with economic advantage, but they don't have a tortious interference with contract claim. If there's nothing else, we would just ask for the Court to affirm. All right. Thank you very much, Mr. Hawes. Anything further, Mr. McKnight? Just briefly, the citation to Cody was incorrect. I apologize for that, but there's a citation in the record with respect to Kemper v. Westchester, which specifically is an Illinois Supreme Court, not only a Supreme Court, but an Illinois 5th District case from 1982 that recognizes that intentional interference can be applied in an intentional interference claim. The other issue is that the factual allegations here, they're picking and choosing as they go along. The critical allegation in the complaint is that the executive committee of Jeffries made a determination and told Mr. Frawley to direct his direct reports to stop iron ore trades. That's an allegation that's set forth. They could talk about whether he had an idea to do it, you know, to resurrect the business or do something else, that that was within his business judgment, but the allegations of the complaint, as they're set forth now, specifically say that Jeffries said, we're out. In fact, later on, when the transaction's presented to the COO, and the COO comes out at a very high level and says to my client, he says, no way. We've been out of this since May 13th. That's not happening. That's exactly what the situation here is. It's a misrepresentation of a fact that was made directly to Mr. Webb, and Mr. Webb then relied upon that factual misrepresentation to his detriment, and that is actionable. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.